## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

_____

**AMANDA SMITH and**         **Court file No._____**
**JAMES SMITH,**

            **Plaintiffs,**

**v.**                          **COMPLAINT**

**I-FLOW CORPATION;**         **Jury Demanded**
**HOSPIRA, INC.; ABBOTT**
**LABORATORIES**

            **Defendants.**

_____

### PLAINTIFFS' COMPLAINT AND JURY DEMAND

NOW COMES the Plaintiffs, Amanda Smith and James Smith, by and through their attorneys and on their causes of action, sue the Defendants, and allege as follows:

### GENERAL ALLEGATIONS AS TO ALL DEFENDANTS

1.     Pain pumps are medical devices that are used to manage post-operative pain. Orthopedic surgeons use pain pumps after surgery to deliver, by way of a catheter, continuous doses of pain relief medication directly into the shoulder. The pump delivers anesthetic drugs for a few days after surgery.

2.     The pumps first used in the 1990s had limited amounts of anesthetic, and surgeons placed the pain pump catheter in the muscle or outside the shoulder joint. Later on, however, the manufacturers increased the anesthetic capacity of the pumps (high volume), and with the knowledge and encouragement of the pain pump manufacturers, surgeons began to insert the catheter directly into the shoulder.

3.      Continuous injection of these anesthetics directly into the shoulder can cause serious and permanent damage to the shoulder joint cartilage.  The damage occurs when the anesthetic kills the chondrocytes (shoulder cartilage cells) which causes cartilage to degenerate progressively.  Patients injured by pain pumps develop a condition called "chondrolysis," which is the complete or nearly complete loss of cartilage in the shoulder joint.  It is an irreversible, disabling, and extremely painful condition.  These patients typically require additional surgeries, including complete shoulder joint replacement.  As written in the medical literature, "the prognosis for these shoulders is grim."[1]

4.      The pain pump companies manufactured and marketed these devices without doing a single study to determine the safety of high-volume pain pumps, or what damage could be caused when physicians placed the catheter directly into the shoulder.  The manufacturers of the anesthetics, similarly, did nothing to investigate whether the continuous infusion of their drugs into shoulder was harmful.  Instead, they encouraged orthopedic surgeons to use the pumps and anesthetics, in tandem, in an untested and dangerous manner.

5.      Indeed, the pain pump manufacturers sought approval from the Food and Drug Administration (FDA) for the placement of the catheter in the shoulder joint space beginning in the late 1990s.  For lack of safety information, the FDA *rejected* their applications – not once, but <u>THREE</u> times.  Yet, the manufacturers of the pumps and anesthetics chose not to advise physicians about these dangers, not to advise patients of these risks, not to tell physicians that their FDA applications were rejected, and continued to sell and market these pumps with reckless indifference–all to the detriment of thousands of patients generally, and the Plaintiff, Amanda Smith, in particular.

---

[1]      Petty, D.H. *et al.*, *Glenohumeral Chondrolysis After Shoulder Arthroscopy*, Am. J. Sports Med. 32:(2)509 (2004).

6.     Multiple scholarly studies were published demonstrating the toxic effects of pain pump anesthetics on shoulder cartilage.  By late 2005 and early 2006, the pain pump industry knew that Dr. Charles L. Beck, an orthopedic surgeon, was reporting to the scientific community some very disturbing findings.  He found a significant number of his shoulder patients developed chondrolysis following placement of a pain pump catheter, and he associated these injuries with the use of pain pumps.

7.     The pain pump companies, and the drug companies whose anesthetics filled these pumps, manufactured and marketed these devices and drugs without ever studying whether they were safe for use in the shoulder joint.  With reckless indifference to the health and safety of these patients, these defendants chose to place profits over safety by choosing not to do those studies necessary to determine the dangers of their products so they could warn physicians about the proper and improper use of surgical pain pumps.

8.     Had the defendant manufacturers conducted those studies that the FDA required back in the 1990s, as they were obligated to do, they would easily have determined that exposure to pain pump anesthetics over time in the shoulder is exceedingly dangerous and contraindicated. Had they performed the appropriate tests timely, Mrs. Smith's physicians would not have used a pain pump in the shoulder, and she would not have suffered the devastating effects of shoulder chondrolysis.

## I.  PARTIES

9.     Plaintiffs, Amanda Smith and James Smith, are citizens of the United States and the State of Michigan, residing in Corunna, Shiawassee County, Michigan.  At all relevant times, Amanda Smith and James Smith were and are wife and husband.

10.     Defendant, I-Flow Corporation, (hereafter "I-Flow") is a Delaware corporation

with its principal place of business in Lake Forest, California. Defendant I-Flow Corporation designs and manufactures a product called a "pain pump," a continuous infusion anesthetic medical device intended to deliver, via catheter, continuous doses of pain relief medication directly into the shoulder joint space. The pain pumps deliver anesthetic pain medication directly into the operative site for 48 hours or more immediately following shoulder surgery. At all times relevant hereto, I-Flow was engaged in Illinois, in the testing, manufacturing, labeling, marketing, distributing, promoting, and selling of pain pumps.

11.     Defendant, Hospira, Inc., (hereafter "Hospira") is a Delaware corporation with its principal place of business in Lake Forest, Illinois. Defendant Hospira is a pharmaceutical company that researches, develops, manufactures and markets generic pharmaceutical products including, but not limited to Marcaine. At all times relevant hereto, Hospira, Inc., was engaged in Illinois, in the testing, manufacturing, labeling, marketing, distributing, promoting, and selling Marcaine.

12.     Defendants, Abbott Laboratories ("Abbott") is an Illinois corporation with its principle place of business at 100 Abbott Park Road, Abbott Park, Illinois 60064-3500. Defendant Abbott is a pharmaceutical company that researches, develops, manufactures and markets generic pharmaceutical products including, but not limited to Marcaine. At all times relevant hereto, Abbott was engaged in Illinois, in the testing, manufacturing, labeling, marketing, distributing, promoting, and selling Marcaine.

## II. JURISDICTION/VENUE

13.     This Court has personal jurisdiction over Defendants pursuant to 28 U.S.C. §1332(1) in that the Plaintiffs are residents of the State of Michigan Defendants are corporations with principal places of business outside of the State of Michigan.

14.     The amount in controversy in this matter exceeds $75,000.00, exclusive of interest and costs.

15.     Venue is proper in this Court, at a minimum, because Defendant Abbot Laboratories is an Illinois corporation and Defendant Hospira has its principle place of business in Illinois.  Moreover, venue is proper in this jurisdiction pursuant to 28 U.S.C. §1391(a)(2). Defendants regularly solicit and engage in business and other persistent courses of conduct and derive substantial revenue from goods used in Illinois and/or for services rendered in Illinois.

16.     Defendants expected or reasonably should have expected that their tortuous acts would have consequences in Illinois.

17.     Defendants derive substantial revenue in Illinois from interstate commerce.

18.     Defendants committed a tortuous act within Illinois by marketing, distributing, retailing and selling dangerous and defective medical devices.

19.     Defendants are amenable to jurisdiction and service of process in Illinois in that Defendants are doing business in Illinois, have committed a tort in whole or in part in Illinois, and/or have continuing minimum contacts in Illinois.

## III.  FACTUAL BACKGROUND

20.     Amanda Smith underwent routine arthroscopic surgery to her left shoulder on January 20, 2006 in Lansing Michigan.  Immediately following the surgery, her doctor inserted a "pain pump."

21.     The Pain Buster was manufactured and sold by defendant I-Flow.  Plaintiffs are informed and believe that the pain pump used in conjunction with her January 2006 surgery was designed, manufactured, marketed, and distributed by I-Flow Corporation.

22.     Amanda's pain pump, through a catheter emanating from the pump and implanted

under the skin, injected pain relief medication directly into her shoulder joint on a continuous basis, for up to 48 hours or more following the surgery.

23.     The pain pump delivered 0.5% Marcaine with epinephrine, manufactured, marketed, and sold by Defendants Abbott and Hospira.  Marcaine is the trade name for bupivicaine manufactured by Defendant Abbott and Hospira.  The pain pump is designed and intended to be used with commonly used anesthetics such as lidocaine or Marcaine, with or without epinephrine, in volumes of 250 cc's or more, over two days or more.  The continuous injection of such medications at such doses over time directly into the shoulder joint, however, routinely causes serious and permanent damage to the cartilage of the shoulder joint.  Amanda Smith had a pain pump inserted post-operatively, and received dangerous doses of continuously injected medication in his shoulder joint.  As a result, Amanda Smith suffered a narrowing of the joint space and/or a condition called "glenohumeral chondrolysis," which is the complete or nearly complete loss of cartilage in the shoulder joint, an irreversible, disabling, and extremely painful condition.

24.     At all times relevant, the Defendants, through promotional materials, publications, literature, product inserts, labeling, advertisements, letters to healthcare professionals, and through the conscious use of its national sales force and territory managers, misrepresented to physicians, including Dr. Dodds, material facts regarding the risks and benefits of pain pumps with continuously injected Marcaine solutions with or without epinephrine to be inserted into the shoulder joint following surgery.

25.     At all times Defendants tested, produced, manufactured, sold, distributed, marketed, processed, promoted, and supplied pain pumps, and the anesthetic drugs to be used in the pain pumps, Defendants knowingly, intentionally, willfully, and purposefully deceived Dr.

Dodds by making false and fraudulent misrepresentations to physicians and the general public including, but not limited to, concealing from Dr. Dodds, and the general public the true facts known by Defendants concerning the safety and efficacy of pain pumps with continuously injected anesthetic solutions such as Marcaine following shoulder surgery.

26.     At times relevant to this action, Defendants made material, false and misleading representations to Amanda Smith, Dr. Dodds, and the public about pain pumps with continuously injected anesthetics.    Specifically, the Defendants made representations that pain pumps including their use with continuously injected anesthetic solutions, such as Marcaine, were safe for use in the shoulder joint following surgery when they knew that such representations were false and unsubstantiated, and considered so by the U.S. Food and Drug Administration.

27.     At all times relevant to this action, Defendants, and each of them, knew that these representations were false and inaccurate. These facts and information were known to the Defendants, and Defendants intentionally withheld and concealed this information from the Plaintiffs, Dr. Dodds and other consumers who purchased pain pumps with continuously injected anesthetic solutions to be used in pain pumps as manufactured and marketed by the Defendants.

28.     At all times during which the Defendants misrepresented material facts to and intentionally concealed from Amanda Smith, her physicians and other consumers of pain pumps with continuously injected anesthetic solutions, Defendants knew that the representations were false and inaccurate. Defendants made the misrepresentations with the intent to deceive and to induce the public, Amanda Smith, and her physician to prescribe and use pain pumps with continuously injected anesthetic solutions for use with pain pumps made and sold by the Defendants.  Defendants intended that Amanda Smith and her physicians would rely on these representations and, in fact, they did so.

29.    Defendants knew and intended that their misrepresentations would induce physicians, including Dr. Dodds, to prescribe pain pumps with continuously injected anesthetic solutions to their patients.  The Defendants also knew and intended that the patients who were the ultimate users of the product would rely upon the misinformation that Defendants had provided to the physicians.

30.    Plaintiff Amanda Smith had no knowledge of the falsity of Defendant's misrepresentations and intentional concealments at the time she purchased and used the Defendant's pain pump with continuously injected anesthetic; and in reliance upon Defendant's misrepresentations, Plaintiff Amanda Smith and her physician believed pain pumps with continuously injected anesthetic solutions to be safe for use following shoulder surgery.

31.    Plaintiff Amanda Smith reasonably relied upon the misrepresentations and was induced to and did, in fact, permit the use by Amanda of a pain pump with a continuously injected Marcaine solution made by Defendants.  Plaintiff Amanda Smith would not have consented to use the pain pump with a continuously injected Marcaine solution had she known and been informed of the true facts concerning the causal nexus between pain pumps with continuously injected anesthetic solutions and glenohumeral chondrolysis.

32.    Amanda Smith and her surgeon, Dr. Dodds, justifiably and reasonably relied upon the misrepresentations of the Defendants because the Defendants were in a special and fiduciary relationship to Plaintiff in that Defendants held themselves out to have expertise in the field of medical devices and pharmaceuticals.

33.    With some or all of the models of the Pain Buster infusion device, I-Flow never received approval for or an indication for use of the infusion pain pump in the shoulder. Moreover, in its dealings with the FDA, I-Flow never fully advised the Food and Drug

Administration about the existence or extent of safety concerns with these devices, which it either knew or should have known.

34.     Amanda Smith has already undergone, or will require, additional surgery, including complete shoulder joint replacement, as a result of the narrowing of the joint space and/or chondrolysis caused by the dangerously defective pain pump containing a continuously injected Marcaine solution.

**CAUSES OF ACTION FOR AMANDA SMITH AND JAMES SMITH**
**COUNT I**
**NEGLIGENCE**

35.     Plaintiff Amanda Smith incorporates by reference the preceding paragraphs of the Complaint.

36.     At all times relevant to this action, Defendants had a duty to exercise reasonable care, and to comply with the existing standard of care, in their preparation, design, research, development, manufacture, inspection, labeling, marketing, promotion and sale of the Pain Buster pain pump and the anesthetics used with the pain pump, which Defendants introduced into the stream of commerce, including a duty to insure that users would not suffer from unreasonable, dangerous or untoward adverse side effects from its use.

37.     At all times relevant to this action, Defendant I-Flow had a duty to warn all health care providers and consumers of the risks, dangers, and adverse side effects of the Pain Buster pain pumps.

38.     At all times relevant to this action, Defendants Abbott and Hospira had a duty to warn all health care providers and consumers of the risks, dangers, and adverse side effects of anesthetics, including Marcaine, when used with the Pain Buster pain pump after shoulder surgery.

39.     At all relevant times, Defendants knew or reasonably should have known that the pain pump and the continuously injected anesthetics used with the pain pump were unreasonably dangerous and defective when used as directed and as designed, including but not limited to the following particulars;

> A.     Commonly used anesthetics likely to be used in pain pumps, including Marcaine, with or without epinephrine, were harmful to human and animal articular cartilage;
>
> B.    Use of the pain pump with continuously injected anesthetic in the shoulder joint space had not been approved by the F.D.A., and in fact had been specifically rejected by the F.D.A.;
>
> C.    Continuous injection of 250 cc's or more of anesthetic, such as Marcaine, with or without epinephrine, through a catheter, directly into the shoulder joint, for two days or more, had not been adequately tested for safety or effectiveness; and
>
> D.    The risk of chondrolysis and other serious post-operative problems associated with using the pain pump with continuously injected anesthetic as designed and instructed outweighed the possible benefits of such use.

40.     Based on what it knew or reasonably should have known as described above, the Defendant I-Flow deviated from principles of due care, deviated from the standard of care, and were otherwise negligent in one or more of the following particulars:

> A.     In failing to instruct or warn the U.S. medical community that the safety of the pain pump with continuously injected anesthetic had not been established for use in the shoulder joint space;

B.       In failing to disclose to the U.S. medical community that continuous injection of commonly used anesthetics such as lidocaine, mepivicaine, or Marcaine, with or without epinephrine, in volumes of 250 cc's or more, over two days or more, into the shoulder joint space, may cause serious and permanent injury to the joint cartilage;

C.       In failing to include a precaution against placing the catheter of the pain pump in the shoulder joint space;

D.       In failing to provide to the U.S. medical community adequate instructions for the safe use of the device with continuously injected anesthetic;

E.       In failing to disclose to the U.S. medical community that the effectiveness of the pain pump with continuously injected anesthetic was uncertain for use in the shoulder joint space;

F.       Manufacturing a product to be used with continuously injected anesthetic, designed to directly inject into the shoulder joint commonly used anesthetics associated with damage to articular cartilage;

G.       Manufacturing a product designed to deliver, over time, dangerously high doses of medication directly into shoulder tissue; and

H.       Promoting the pain pump and continuously injected anesthetics for use in the shoulder joint space after the FDA had considered and rejected such an indication.

41.    Based on what they knew or reasonably should have known as described above in paragraphs, the Defendants Abbott and Hospira deviated from principles of due care, deviated from the standard of care, and were otherwise negligent in one or more of the following

particulars:

    A.    In failing in their duty to warn physicians of the dangers of using Marcaine for long periods of time in the shoulder joint space;

    B.    In failing to test and investigate, both *in vivo* and *in vitro*, the use of the anesthetic drugs Marcaine, in arthroscopic surgery of the shoulder;

    C.    In failing to warn the U.S. medical community that the safety of Marcaine for use with pain pumps in the shoulder space had not been established;

    D.    In failing to disclose to the U.S. medical community that continuously injected anesthetics such as Marcaine, in the shoulder space in volumes of 250 cc's or more over a certain period of time, may cause serious and permanent injury to the joint cartilage;

    E.    In failing to instruct or include a precaution that Marcaine should not be used with pain pump where the catheter is placed in the joint space of the shoulder;

    F.    In failing to disclose to the U.S. medical community that the safety of Marcaine was uncertain for use with pain pumps in the shoulder space;

    G.    In failing to warn manufacturers, sellers, and distributors of pain pumps that the safety of Marcaine was uncertain for use with pain pumps in the shoulder space;

    H.    Manufacturing Marcaine with the knowledge that these anesthetics were being suggested for use by Defendant I-Flow for use with pain pumps in the shoulder joint and dangerously high doses and durations, and knowing that the use of these anesthetics in such a manner was associated with

damage to articular cartilage; and

I.    In promoting the use of Marcaine for use with pain pumps at high doses for long durations in the shoulder joint without FDA approval for such an indication.

42.    The product defect alleged above was a substantial contributing cause of the injuries and damages suffered by Amanda Smith.

43.    The injuries and damages suffered by the Amanda Smith were the reasonably foreseeable results of Defendants' negligence.

44.    Had Amanda Smith not permitted the use of the Defendant's pain pump with continuously injected Marcaine, she would not have suffered the injuries and damages described with particularity, above.

45.    As a direct and proximate cause of the Defendants' negligence, Amanda Smith suffered the permanent loss of cartilage in her shoulder, resulting in severe pain and discomfort of the shoulder, loss of use and function of the shoulder and arm, requiring multiple surgeries. Amanda will also require future medical care, including physical therapy, pain management, additional shoulder surgeries as he ages, including but not limited to, shoulder replacement. In addition, Amanda has suffered mental distress and anguish and has suffered permanent impairment of the use and function of her affected upper extremities, and other damages.

WHEREFORE, Plaintiff Amanda Smith prays for judgment against Defendants, jointly and severally, in an amount which will compensate her for her injuries, and punitive damages in an amount which will deter the Defendants and others from like conduct.

## COUNT II
## NEGLIGENT MISREPRESENTATION

46.    Plaintiff Amanda Smith incorporates by reference the preceding paragraphs of the

Complaint.

47.     Defendants, in the course of their businesses, negligently misrepresented and communicated to her and/or her physicians false information upon which she relied for guidance in her decision to use a pain pump with continuously injected anesthetic following Plaintiff's shoulder surgery.

48.     The false information supplied by Defendants to Plaintiff Amanda Smith and/or Plaintiff's physicians was that its pain pumps with continuously injected anesthetic were safe, effective, and would not harm or adversely affect Plaintiff's health.

49.     In making such representations, Defendants knew or should have known that the representations were false and not completely accurate at the time Defendants made the representations.   As such, Defendants failed to exercise reasonable care of competence in obtaining or communicating truthful and accurate information to Plaintiff Amanda Smith and Plaintiff's physicians, and failed to comply with the existing standard of care.

50.     The misrepresentations and false information communicated by Defendants to Plaintiff Amanda Smith and Plaintiff's physicians were material and Plaintiff Amanda Smith, and her physicians justifiably relied in good faith on Defendants' misrepresentations and false information, all to her detriment.

51.     As a direct and proximate result of the negligent misrepresentations by Defendants and their agents and sales representatives, Plaintiff Amanda Smith suffered and will continue to suffer injuries, damages, and losses as alleged herein.

WHEREFORE, Plaintiff Amanda Smith prays for judgment against Defendants, jointly and severally, in an amount which will compensate the Plaintiff for her injuries, and punitive damages in an amount which will deter the Defendants and others from like conduct.

## <u>COUNT III</u>
## <u>FRAUD</u>

52.     Plaintiff Amanda Smith incorporates by reference the preceding paragraphs of the Complaint.

53.     Defendant Iflow through its agents and sales representatives knowingly and intentionally made material misrepresentations to Plaintiff Amanda Smith, Plaintiff's physicians, and to the public that pain pumps and the continuously injected anesthetics used with the pumps were safe for use following shoulder surgeries, such as Plaintiff's.

54.     The representations by Defendant I-Flow's agents and sales representatives were in fact false, as pain pumps and the continuously injected anesthetic used in the pumps were not safe for human use following shoulder surgeries, and instead proximately caused glenohumeral chondrolysis and other injuries and/or adverse side effects.

55.     When Defendant I-Flow's agents and sales representatives made these representations that its pain pumps were safe for use following shoulder surgeries such as Plaintiff's, they knew those representations were false, deceptive, and misleading, and they made those false representations with the intent to defraud, deceive, and mislead.

56.     Plaintiff Amanda Smith, Plaintiff's physicians, and the public justifiably relied upon the misrepresentations of Defendant I-Flow's agents and representatives and reasonably believed the misrepresentations to be true, and in justifiable reliance upon these misrepresentations, were induced to prescribe and use Defendant's pain pumps and the continuously injected anesthetics.

57.     As a result of the fraud of Defendant I-Flow's agents and sales representatives, Plaintiff Amanda Smith suffered and will continue to suffer injuries, damages, and losses as alleged herein.

58.     Defendant I-Flow's reckless and intentional concealment from Plaintiff Amanda Smith and her physicians that pain pumps and the continuously injected anesthetic used in the pump were not safe for human use following shoulder surgery, and cause glenohumeral chondrolysis, was oppressive, extreme, malicious, fraudulent, and outrageous conduct in that such conduct was and is so outrageous in character and so extreme in degree that it goes and went beyond all possible bounds of decency and is atrocious and utterly intolerable in a civilized community.

59.     As a direct and proximate result of Defendants' extreme and outrageous conduct, Plaintiff Amanda Smith has suffered and continues to suffer serious physical harm and severe emotional distress.

60.     As a further direct and proximate result of Defendants' outrageous conduct, Plaintiff Amanda Smith suffered and will continue to suffer injuries, damages, and losses as alleged herein.

WHEREFORE, Plaintiff Amanda Smith prays for judgment against Defendants, jointly and severally, in an amount which will compensate the Plaintiff for her injuries, and punitive damages in an amount which will deter the Defendants and others from like conduct.

## COUNT IV
## STRICT PRODUCT LIABILITY

61.     Plaintiff Amanda Smith incorporates by reference the preceding paragraphs of the Complaint.

62.     Amanda Smith is in the class of persons that the Defendants should reasonably foresee as being subject to the harm caused by a defectively designed pain pump, and the anesthetic medications used in them, insofar as she was the type of person for whom the pump with continuously injected anesthetics was intended to be used.

63.    I-Flow, which is engaged in the business of selling the product, manufactured and supplied the pain pump and placed it into the stream of commerce in a defective and unreasonably dangerous condition such that the foreseeable risks exceeded the benefits associated with the design and/or formulation of the product.

64.    Defendants Abbott and Hospira were engaged in the business of selling Marcaine and placed the product into the stream of commerce in a defective and unreasonably dangerous condition such that the foreseeable risks exceeded the benefits associated with the use of the product continuously injected into the shoulder through the use of a pain pump.

65.    The pain pump supplied to Amanda Smith was defective in design and formulation and unreasonably dangerous when it left the hands of Defendant I-Flow, the manufacturer and supplier, and it reached the user and consumer of the product, Amanda Smith, without substantial alteration in the condition in which it was sold.

66.    The anesthetics supplied to Amanda Smith were defective in design and formulation and unreasonably dangerous when they left the hands of the Defendants Abbott and Hospira, the manufacturers and suppliers, and they reached the user and consumer of the products, Amanda Smith, without substantial alteration in the condition in which they were sold.

67.    The pain pump device manufactured by Defendant I-Flow and anesthetics manufactured by Defendants Abbott and Hospira were unreasonable and dangerously defective beyond the extent contemplated by ordinary patients with ordinary knowledge regarding these products.

68.    I-Flow's pain pumps were defective due to inadequate warning and/or inadequate clinical trials, *in vivo* and *in vitro* testing and study, and inadequate reporting regarding the results of such studies.

69.     The anesthetics manufactured by the Defendants Abbott and Hospira were defective due to inadequate warning and labeling and/or inadequate clinical trials, *in vivo* and *in vitro* testing and study, on the use of continuously injected anesthetics for use in pain pumps used in the shoulder, and inadequate reporting regarding the results of such studies.

70.     I-Flow's pain pumps were defective due to inadequate post-marketing warning or instruction because, after I-Flow knew or should have known of the risk of injury from its pain pumps, it failed to provide adequate warnings to the medical community and patients, and continued to promote the products as safe and effective.

71.     The anesthetics manufactured by Defendants Abbott and Hospira were defective due to inadequate post-marketing warning or instruction because, after these Defendants knew or should have known of the risk of injury from their anesthetics continuously injected in the shoulder via pain pumps, they failed to provide adequate warnings to the medical community and patients, and continued to promote the products as safe and effective.

72.     The product defects alleged above were a substantial contributing cause of the injuries suffered by Amanda Smith.  Specifically, the pain pump with continuously injected anesthetic caused Amanda Smith to suffer the permanent loss of cartilage in her shoulder, resulting in severe pain and discomfort of the shoulder, loss of use and function of the shoulder and arm, and requiring multiple surgeries.  The use of the I-Flow pain pump with continuously injected Marcaine, also rendered the therapeutic benefit of her shoulder surgery worthless and of no value.  Amanda Smith will also require future medical care, including additional shoulder surgeries, including but not limited to, shoulder replacement.  In addition, Amanda has suffered mental distress and anguish and has suffered permanent impairment of the use and function of his affected upper extremities.

WHEREFORE, Plaintiff Amanda Smith prays for judgment against Defendants, jointly and severally, in an amount which will compensate the Plaintiff for her injuries, and punitive damages in an amount which will deter the Defendants and others from like conduct.

**COUNT V**
**STRICT PRODUCTS LIABILITY - FAILURE TO WARN**

73.     Plaintiff Amanda Smith incorporates by reference the preceding paragraphs of the Complaint.

74.     Defendant I-Flow manufactured pain pumps, and placed them into the stream of commerce in a defective and unreasonably dangerous condition such that the foreseeable risks exceeded the benefits associated with the design and/or formulation of the product.

75.     Defendants Abbott and Hospira manufactured the anesthetic Marcaine that was used with pain pumps, and placed it into the stream of commerce in a defective and unreasonably dangerous condition such that the foreseeable risks exceeded the benefits associated with the design and/or formulation of the product.

76.     Defendant I-Flow's pain pumps were defective due to inadequate warning and/or inadequate clinical trials, *in vivo* and *in vito* testing and study, and inadequate reporting regarding the results.

77.     The Marcaine manufactured by Defendants Abbott and Hospira was defective due to inadequate warning and/or inadequate clinical trials, *in vivo* and *in vito* testing and study, and inadequate reporting regarding the results, regarding the use of Marcaine continuously injected in the shoulder joint with a pain pump.

78.     Defendant I-Flow's pain pumps were defective due to inadequate post-marketing warning or instruction because, after I-Flow knew or should have known of the risk of injury from its pain pumps, it failed to provide adequate warnings to the medical community and

patients, and continued to promote the pain pumps as safe and effective.

79.     The Marcaine produced by Defendants Abbott and/or Hospira was defective due to inadequate post-marketing warning or instruction because, after Abbott and Hospira knew or should have known of the risk of injury from their continuously injected Marcaine used in pain pumps, they failed to provide adequate warnings to the medical community and patients, and continued to promote the product as safe and effective.

80.     The defective warnings and labeling on the pain pumps and the anesthetics used with the pumps were substantial factors in bringing about the injuries to the Plaintiff.

81.     As the direct and proximate cause of the defective condition of pain pumps with continuously injected anesthetic as manufactured and/or supplied by Defendants, and specifically its failure to warn, and its negligence, carelessness, other wrongdoing and actions described herein, Plaintiff suffered those injuries and damages as described with particularity, above.

WHEREFORE, Plaintiff Amanda Smith prays for judgment against Defendants, jointly and severally, in an amount which will compensate the Plaintiff for her injuries, and punitive damages in an amount which will deter the Defendants and others from like conduct.

## <u>COUNT VI</u>
## <u>BREACH OF IMPLIED WARRANTY</u>

82.     Plaintiff Amanda Smith incorporates by reference the preceding paragraphs of the Complaint.

83.     Plaintiff purchased and/or ultimately obtained a pain pump from I-Flow.

84.     Defendant I-Flow impliedly warranted to the public in general, to health care providers, including Plaintiff's physicians and to Plaintiff Amanda Smith, that the product sold by it, or under its supervision, direction and control, was merchantable and reasonably fit and suitable for the ordinary purposes for which the pain pump is used, and the product conformed to

the standards imposed by law, and was safe and efficacious when used as intended.

85.    Plaintiff Amanda Smith purchased and/or ultimately obtained Marcaine for use in the pain pump from Abbotta and/or Hospira.

86.    In the design, manufacture, marketing, distribution and sale of the anesthetic Marcaine used in the pain pumps, the manufacturing Defendants, Abbott and/or Hospira, impliedly warranted to the public in general, to health care providers, including Plaintiff's physician, and to the Plaintiffs, that the Marcaine sold by them, or under their supervision, direction and control, was merchantable and reasonably fit and suitable for the ordinary purposes for which the anesthetics were used with the pain pump, and the products conformed to the standards imposed by law, and were safe and efficacious when used as intended.

87.    Plaintiff Amanda Smith relied on the skill and judgment and implied warranty of Defendants that their pain pumps with continuously injected Marcaine were of merchantable quality and safe and fit for the use for which it was intended.

88.    The Defendants' products were unsafe for their intended use, and were not of merchantable quality, as warranted by Defendants, in that they had very dangerous propensities when put to their intended use and caused severe injury to Amanda Smith.  Defendants' products were unaccompanied by warnings of their dangerous propensities, either known or reasonably scientifically knowable at the time of distribution.  The aforesaid products did cause Plaintiff to sustain injury and damages as herein alleged.

89.    The product defects alleged above were a substantial contributing cause of the injuries and damages suffered by Plaintiff.

90.    As a result of Defendants' breach of implied warranty, Plaintiff suffered and will continue to suffer injuries, damages, and losses as alleged herein.

WHEREFORE, Plaintiff Amanda Smith prays for judgment against Defendants, jointly and severally, in an amount which will compensate the Plaintiff for her injuries, and punitive damages in an amount which will deter the Defendants and others from like conduct.

## COUNT VII
## BREACH OF EXPRESS WARRANTY

91.     Plaintiff Amanda Smith incorporates by reference the preceding paragraphs of the Complaint.

92.     Plaintiff Amanda Smith purchased and/or obtained a pain pump from I-Flow.

93.     Defendant I-Flow expressly warranted in its written literature, advertisements and representations of its representatives and agents, that its pain pumps were safe, effective, fit, and proper for the use for which it was intended.

94.     Plaintiff Amanda Smith purchased and/or obtained Marcaine from Defendants Abbotta and/or Hospira.

95.     Defendants Abbott and/or Hospira expressly warranted in their written literature, advertisements and representations of its representatives and agents, that their Marcaine was safe, effective, fit, and proper for the use for which it was intended.

96.     Plaintiff relied on the skill and judgment and express warranties of Defendants that the pain pump with continuously injected Marcaine was safe, effective, fit, and proper for the use for which it was intended.

97.     The express warranties were untrue, false, and inaccurate in that the pain pumps with continuously injected Marcaine were not safe, effective, fit, nor proper for the use for which they were intended.

98.     As a direct and proximate result of the breach of express warranty by Defendants, Plaintiff suffered and will continue to suffer injuries, damages, and losses as alleged herein.

WHEREFORE, Plaintiff Amanda Smith prays for judgment against Defendants, jointly and severally, in an amount which will compensate the Plaintiff for her injuries, and punitive damages in an amount which will deter the Defendants and others from like conduct.

## COUNT VIII
## LOSS OF CONSORTIUM

99.     Plaintiffs Amanda and James Smith incorporate by reference all other paragraphs of this Complaint as if fully set forth herein at length, and further allege.

100.    Plaintiffs are husband and wife.

101.    Plaintiff James Smith, as a result of the injuries sustained by Amanda Smith, described above, has suffered loss of consortuim.  He has suffered, and will continue to suffer in the future, the loss of comfort, society, affection, love, companionship, solace, moral support, assistance, conjugal fellowship and other damages.

102.    Accordingly, Plaintiff James Smith seeks and is entitled to compensatory damages in an amount to be determined at trial.

WHEREFORE, Plaintiffs James Smith and Amanda Smith demand judgment against Defendants, as follows:

A.      Compensatory damages in an amount in excess of $75,000.00 as provided by law and to be supported by the evidence at trial;

B.      An award of attorneys' fees, pre-judgment and post-judgment interest, and the costs of suit, as provided by law; and

C.      Such other legal and equitable relief as this Court deems just and proper.

### DEMAND FOR JURY TRIAL

Plaintiffs, James Smith and Amanda Smith hereby demand a jury trial on all claims so triable in this action.

Respectfully submitted,

Hal J. Kleinman, Esq.
Robert K. Jenner, Esq. (*pro hac vice* to be filed)
**Janet, Jenner & Suggs LLC**
1829 Reisterstown Road, Suite 320
Baltimore, MD  21208
(410) 653-3200

Greg L. Laker, Esq. (*pro hac vice* to be filed)
Jeff S. Gibson, Esq. (*pro hac vice* to be filed)
Elizabeth J. Doepken, Esq. (*pro hac vice* to be filed)
**Cohen and Malad, LLP**
One Indiana Square, Suite 1400
Indianapolis, IN 46204
(317) 636-6481

*Attorneys for Plaintiffs*